Jeffery **FRITZ**, Plaintiff,

v.

**MASCOTECH AUTOMOTIVE SYSTEMS GROUP, INC., d/b/a Mascotech Engineering, Defendant.**

**No. 95–CV–71595–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 13, 1996.

Ronald M. Rothstein, Southfield, Michigan, for Plaintiff.

Melanie T. LaFave, Detroit, Michigan, for Defendant.

### OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I.  INTRODUCTION

Plaintiff Jeffery Fritz ("Plaintiff") commenced this action in Wayne County Circuit Court on March 21, 1995, alleging that Defendant Mascotech Automotive Systems Group, Inc. ("Defendant"), his employer from November 1, 1993, through August 25, 1994, unlawfully discriminated against him because of his disability, juvenile onset diabetes. Defendant removed this action to this Court based on Plaintiff's assertion of a federal claim under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff also alleges a violation of Michigan's Handicappers' Civil Rights Act ("MHCRA"), Mich.Comp.Laws § 37.1101 *et seq.*

On October 31, 1995, Defendant filed a motion for summary judgment, arguing that Plaintiff's record of absences and tardiness renders him ineligible for consideration as either a "qualified individual with a disability" under the ADA or a "handi-

capped" individual under the MHCRA. Plaintiff responds that his ongoing absences and tardiness were attributable to Defendant's discriminatory imposition of various terms and conditions on his employment. According to Plaintiff, these onerous conditions were imposed because of the skepticism of Clifton Tally, Jr., Defendant's senior engineering manager, that Plaintiff's initial tardiness was in fact due to his diabetic condition.

Counsel for the parties addressed this motion at a hearing before this Court on January 25, 1996. After considering the arguments made at that hearing and reviewing the materials submitted by the parties, the Court finds that some key issues remain unresolved under the present record. Accordingly, for the reasons stated below, the Court denies Defendant's motion for summary judgment.

## II. *FACTUAL BACKGROUND*

Plaintiff was employed by Defendant as a computer-aided designer ("CAD designer") from October 25, 1993, through August 25, 1994.[1] Plaintiff worked at Defendant's Dearborn facility, at which Defendant's employees engaged in the design and prototype development of motor vehicle components. This facility was managed by Clifton Tally, Jr. ("Tally"), a senior engineering manager. Plaintiff was paid at the rate of $30 per hour, and his work largely consisted of using a computer to draft designs of various automotive components.

At age eleven, Plaintiff was diagnosed as having juvenile onset diabetes. He gives himself insulin injections at least once a day, and monitors his blood sugar level two or three times a day. In addition, he suffered a heart attack and underwent heart bypass surgery in 1992, when he was 32 years old.

Plaintiff disclosed these health conditions in an interview with Tally shortly before he was hired by Defendant. During that interview, Plaintiff indicated that he had not had any recent problems with his diabetes. Plaintiff further stated that the 50 to 56 hours per week demanded by the job would be satisfactory. Finally, Plaintiff and Tally discussed the starting time for the job, which ranged between roughly 6:00 and 8:00 a.m.

In his first month of employment with Defendant, Defendant's records indicate that Plaintiff was late for work fourteen times. This tardiness was often substantial; the records indicate that on nine occasions, Plaintiff did not arrive at work until after noon. At his deposition, Plaintiff testified that adjustments to his schedule had altered his insulin requirements during this time period. These schedule changes caused him to awake in the morning with hypoglycemic (low blood sugar) reactions and occasional insulin shock, which rendered him unable to drive to work or otherwise function normally until he could restore his blood sugar level by eating or drinking something with a high sugar content. According to Plaintiff, this process of restoring his blood sugar level could take anywhere from fifteen minutes to two hours. Moreover, Plaintiff states that he could avoid further hypoglycemic reactions only through trial-and-error adjustment of his insulin intake. An affidavit submitted by Plaintiff's physician, Dr. Aronsson, indicates that it took several months of adjusting Plaintiff's insulin dosage to solve this problem.

Concerned with this habitual tardiness, Tally met with Plaintiff on December 3, 1993. The parties dispute the conversation at that meeting. Plaintiff contends that Tally fired him, based on his disbelief that Plaintiff's late arrivals were due to his diabetic condition. According to Plaintiff, he returned to work only after he appealed to Defendant's human resources department and someone within that department ordered him reinstated. Tally, on the other hand, testified at his deposition that he merely warned Plaintiff that further tardiness would lead to his dismissal. According to Tally, Plaintiff was instructed to produce documentation verifying

---

1. In a charge filed with the EEOC and in his complaint, Plaintiff lists his date of discharge as August 25, 1994. However, in his brief in response to Defendant's motion for summary judgment, Plaintiff states that he was an employee of Defendant through September 9, 1994. In addition, Defendant's records show that the effective date of Plaintiff's layoff was September 9, and that Plaintiff worked several hours in the weeks between August 25 and September 9.

his medical condition and his need for occasional time off before returning to work.

The parties agree about the ultimate outcome of the December 3 meeting. Although Plaintiff continued to work for Defendant, several conditions were imposed upon him. He was placed on probation for ninety days, and was assigned a task that, in Tally's words, was "kind of boring work," "less demanding," and typically required fewer hours per work week. During the probationary period, Plaintiff was forbidden to work later than 6:00 p.m. At his deposition, Tally testified that this restriction was dictated by the need of evening-shift workers to gain access to computer equipment, the need to supervise and communicate with Plaintiff as he performed his work, and Tally's concern that Plaintiff might experience a diabetic reaction in an unoccupied section of the facility. Tally also insisted that Plaintiff punch a time clock, counter to the typical practice for daytime employees.

In addition, after the December 3 meeting, Plaintiff was required to obtain a note from his physician whenever his diabetic condition caused him to be late or absent. Tally's deposition testimony reveals his suspicion, formed prior to the December 3 meeting, that at least some of Plaintiff's tardiness might be attributable to factors other than his diabetic condition. (Tally Dep. at 57–60). Accordingly, Tally testified that he imposed the doctor's note requirement in order to verify both that Plaintiff had in fact suffered a diabetic reaction and that he was fit to return to work. (Tally Dep. at 81–82).

Plaintiff, however, protests that this last condition was at best useless and at worst counterproductive. In his account, by the time he recovered sufficiently from his hypoglycemic reactions to drive to his physician's office, he would no longer exhibit any symptoms of his earlier reaction, and his doctor therefore would be unable to verify his illness. Plaintiff's physician corroborates this claim in his affidavit, stating that by the time Plaintiff appeared at his office, "I had no way

of determining objectively whether or not he had suffered hypoglycemic shock or very low blood sugar." (Aronsson Aff. at 5). Plaintiff further states that he had to travel a significant distance out of his way and often wait a substantial amount of time in order to obtain a doctor's note. Thus, Plaintiff contends that this requirement actually exacerbated his attendance problems. At his deposition, Tally conceded that he "may have been unreasonable initially" in imposing this requirement, and he noted that he eventually permitted Plaintiff to obtain a doctor's note by telefax.

After these conditions were imposed, Plaintiff's attendance problems persisted. Defendant's records indicate that, in a fourteen-week period between January and April, 1994, Plaintiff missed seventeen days of work and achieved a forty-hour work week only twice. Accordingly, Tally again met with Plaintiff on April 11, 1994; Tally's report from this meeting lists the subject as Plaintiff's "excessive, non diabetes related absenteeism," and specifically expresses the concern that Plaintiff's poor attendance "makes it difficult to assign work to Jeff." Following this meeting, Plaintiff was again placed on probation, was limited to forty-hour work weeks and eight-hour days, was forbidden from working on weekends, and was required to call and speak personally to his direct supervisor, Gary Mathiak, whenever he was going to be late or absent. Plaintiff was further advised that three violations of his probation would lead to his dismissal, but that late arrivals or absences due to his diabetic condition would not count as probation violations provided that Plaintiff properly advised his supervisor and obtained a doctor's written authorization to return to work. Plaintiff acknowledged these additional conditions, but opined that they were unfair and unnecessary.

Plaintiff's attendance problems continued beyond the April 11 meeting and until his layoff in late August or early September, 1994.[2] Defendant's records indicate that

---

**2.** The parties dispute whether Plaintiff was laid off or discharged. Plaintiff alleges that other CAD designers have been hired since his layoff, but that he was never called back. Plaintiff also notes that around the time of his layoff, Defen-

dant placed advertisements in local newspapers stating that the company had immediate openings for CAD designers. Defendant, on the other hand, points to its records expressly stating that Plaintiff was laid off, and also notes that four

Plaintiff worked a forty-hour week only five times in the nineteen weeks prior to his layoff; three of these forty-hour weeks followed immediately after the April 11 meeting. In the brief supporting its motion for summary judgment, Defendant summarizes Plaintiff's overall attendance record during his 45–week tenure: he missed 30 full days, representing 13.3% of the total work days, and he was absent during some portion of 76 days, comprising 33.7% of the total.

Despite this attendance record, Defendant cited a general reduction in staff, rather than attendance problems, as the reason for Plaintiff's layoff. Indeed, Defendant's record of the layoff includes a note by Tally stating that Plaintiff was "recommended for rehire." However, Tally testified at his deposition that employees were selected for layoff based on their value to the company. (Tally Dep. at 132). Tally also explained that he would recommend Plaintiff for rehire only at a "less critical level." (Tally Dep. at 134).

## III. *ARGUMENTS OF THE PARTIES*

In order to understand the arguments raised for and against Defendant's motion for summary judgment, it is first necessary to consider the exact nature of Plaintiff's claims. In essence, Plaintiff's complaint alleges three types of discriminatory action by Defendant, all based upon his diabetic condition. First, Plaintiff contends that Defendant wrongfully discharged him twice: once at the December 3, 1993, meeting with Tally, and then again in late August or early September, 1994, under the pretext of a reduction in staff. Next, Plaintiff alleges that Defendant imposed various improper terms and conditions on his employment, including the doctor's note requirement and the restriction to eight-hour days and forty-hour work weeks.

Finally, Plaintiff claims that Defendant, and specifically Tally, unlawfully created a hostile work environment. According to Plaintiff, once Tally dismissed Plaintiff's claims of diabetes-related tardiness as unworthy of credence, he thereafter made various remarks to Plaintiff indicating that he

was "useless" and that Tally would eventually find a way to fire him. Plaintiff alleges that on one occasion, Tally's remarks so upset him that he had to be hospitalized for several days for a possible heart attack. Plaintiff further contends that he was given defective computer equipment with which to perform his work. Plaintiff thus views Tally's hostility as part and parcel of Defendant's broader discriminatory treatment of him, all of which prevented him from succeeding in his employment.

Defendant advances two arguments in support of its contention that the above claims are deficient as a matter of law under the present record. First, Defendant contends that Plaintiff's excessive absences and tardiness render him, as a matter of law, neither a "qualified individual with a disability" under the ADA nor a "handicapped" individual under the MHCRA. Because Plaintiff failed to satisfy the basic requirement of regular job attendance, Defendant argues that it was under no duty to accommodate Plaintiff's disability. Alternatively, even if Plaintiff is viewed as a qualified individual, Defendant contends that Plaintiff has failed to put forward any evidence that Defendant's treatment of Plaintiff was motivated by improper consideration of his disability rather than proper consideration of his poor attendance record.

In response, Plaintiff argues that his ongoing attendance problems were caused by Defendant's discriminatory treatment of him early in his employment. Plaintiff therefore reasons that his absences and tardiness, far from establishing his unfitness for employment, actually serve as evidence that Defendant treated him unfairly by imposing discriminatory job conditions and refusing to accommodate, or even fully acknowledge, his diabetic condition. Finally, Plaintiff points to various incidents throughout his employment relationship with Defendant—and, in particular, Tally's continued refusal to believe that Plaintiff's attendance problems were due to his diabetes—as sufficient to raise an infer-

---

other CAD designers, all with more seniority than Plaintiff, were laid off on the same date. Because the disposition of Defendant's motion

does not turn on the proper characterization of this event, the Court need not resolve this issue.

ence that Defendant acted with discriminatory motives.

## IV. ANALYSIS

### A. The Standards Governing Consideration of a Motion for Summary Judgment

A federal court may properly grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions—*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 321, 106 S.Ct. at 2552.

▪ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in evaluating Defendant's motion for summary judgment.

### B. Plaintiff's Poor Attendance Record Does Not Preclude Recovery Under the ADA.

In Count I of his complaint, Plaintiff alleges that Defendant violated the ADA by subjecting him to various forms of mistreatment because of his diabetic condition. The ADA forbids discrimination in employment based on an employee's disability:

· No covered entity shall discriminate against a qualified individual with a disabil-

---

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 35 (Supp.1994).

ity because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). This same provision expressly defines the term "discriminate" as including:

limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee.

42 U.S.C. § 12112(b)(1).

▪ The Sixth Circuit has stated that "[t]he ADA parallels the protection of the Rehabilitation Act," 29 U.S.C. § 701 *et seq.*, which forbids discrimination on the basis of disability under any program or activity receiving federal assistance. *Maddox v. University of Tennessee*, 62 F.3d 843, 846 & n. 2 (6th Cir.1995). Accordingly, the standards developed in cases involving the Rehabilitation Act carry over to the instant matter. In particular, in order to prevail in his ADA claim, Plaintiff must show (1) that he has a "disability," (2) that he was "qualified" for his position with Defendant, and (3) that Defendant subjected him to discriminatory treatment "solely by reason of" his disability. *Maddox*, 62 F.3d at 846 (citing *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir.1988)); *see also Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 212 (4th Cir.1994).

The parties here do not dispute that Plaintiff's diabetes constitutes a "disability" under the ADA. Rather, Defendant's initial basis for seeking summary judgment focuses on the second prong of the ADA inquiry: namely, whether Plaintiff was "qualified" for his job. If not, then the Court need not inquire whether Defendant acted with discriminatory motives, because Plaintiff would not enjoy the protection of the ADA in any event.

The ADA defines what it means to be a "qualified individual with a disability":

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential.

42 U.S.C. § 12111(8). Defendant argues that attendance and punctuality are "essential functions" of the job held by Plaintiff. Accordingly, because Plaintiff failed to perform these "essential functions," Defendant concludes that Plaintiff was not a "qualified individual" as that term is defined under the ADA.

Defendant's line of reasoning enjoys substantial support in the case law. For example, in *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir.1994), the Fourth Circuit held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." The plaintiff in *Tyndall* suffered from lupus, and claimed that her frequent absences and tardiness were largely attributable to this disability. 31 F.3d at 211. The plaintiff argued that she was qualified for her job "because she could perform all of her teaching duties and received 'excellent' and 'good' performance evaluations." 31 F.3d at 213.

The court, however, rejected this narrow view of a "qualified individual":

[A]n evaluation of the quality of Tyndall's performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd*, 831 F.2d 298 (6th Cir.1987). Therefore, a regular and reliable level of attendance is a necessary element of most jobs.

31 F.3d at 213; *see also Carr v. Reno*, 23 F.3d 525, 529–30 (D.C.Cir.1994) (finding, in a Rehabilitation Act claim, that "an essential

function of any government job is an ability to appear for work").

Defendant contends that this case law ineluctably leads to the conclusion that Plaintiff's poor attendance record precludes him, as a matter of law, from protection as a "qualified individual" under the ADA. Plaintiff responds that this case law is distinguishable because his poor attendance was in fact *caused* by Defendant's prior discriminatory treatment of him. In his view, if Defendant had simply permitted him to arrive late on those occasions when his diabetic condition so dictated, he could have stayed at work as late as necessary to perform the truly "essential functions" of his job. Because Defendant instead imposed onerous conditions on him, such as requiring him to go through the time-consuming process of obtaining a doctor's note every time his diabetic condition worsened, Plaintiff contends that Defendant's actions prevented him from fully performing his job.

■ On closer inspection, *Tyndall* seems to leave room for the sort of argument Plaintiff advances. The *Tyndall* court stated that two distinct inquiries are necessary to determine whether an individual is "qualified" under the ADA. In addition to considering whether an individual can perform the essential functions of a job, a court must also inquire whether "any reasonable accommodation by the employer would enable [the employee] to perform those functions." 31 F.3d at 213 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993)). Thus, in *Tyndall*, the court placed importance on the fact that the employer's "extensive accommodation of Tyndall's lupus condition did not improve her attendance level." 31 F.3d at 214. The court reached the conclusion that Tyndall was not a "qualified individual" only after determining *both* that regular attendance was an essential function of her job *and* that her employer's "more than reasonable accommodations for her ... disability" had failed to cure her attendance problems. 31 F.3d at 214; *see also Carr v. Reno*, 23 F.3d 525, 529–30 (D.C.Cir.1994) (noting that the employer's reasonable accommodation of the employee's disability "did not result in improved attendance").

■ Returning to the instant matter, then, it appears that Plaintiff does not forfeit the protection of the ADA solely by virtue of his poor attendance. Rather, Defendant's course of conduct is also relevant to the determination whether Plaintiff is a "qualified individual" under the ADA. In particular, Defendant is entitled to prevail as a matter of law only if the record shows *both* that attendance and punctuality were essential functions of Plaintiff's job *and* that Defendant's reasonable attempts to accommodate Plaintiff failed to enable him to satisfy those functions. The Court finds that Defendant has persuasively argued the first of these two points, but has largely overlooked the second.

■ The record before the Court adequately establishes that the job at issue here does not present that unusual case in which regular attendance and punctuality are unnecessary. Rather, Plaintiff was advised in a pre-hire interview that the starting time for his job was between 6:00 and 8:00 a.m. each day. This pre-employment statement indicates that Defendant placed some importance on punctuality, and refutes the suggestion that Defendant imposed a condition of timely arrival only in response to Plaintiff's initial tardiness. *Cf.* 29 C.F.R. § 1630.2(n)(3)(ii) (citing "[w]ritten job descriptions prepared before advertising or interviewing applicants" as evidence that a function is "essential" under the ADA). Moreover, Defendant has offered valid justifications for its insistence that Plaintiff keep regular hours, including the shortage of computer equipment and the need to occasionally consult with and supervise Plaintiff as he performed his work. Finally, the ADA specifically dictates that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

The Court therefore rejects Plaintiff's contention that he was "qualified" because he could perform the "essential functions" of his job without any accommodation whatsoever by Defendant. In essence, Plaintiff asserts that the job of CAD designer does not require regular and uniform attendance, but simply requires that the work get done.

However, Plaintiff offers virtually no support for his contention that both industry custom and routine practice at Defendant's Dearborn facility would permit CAD designers to work completely flexible hours over an extended period of time so long as their assigned tasks were being accomplished.[4] Neither has Plaintiff shown that his poor attendance record was *entirely* attributable to the discriminatory conditions imposed upon him by Defendant, rather than at least partly due to his need for some sort of flexible work schedule. Indeed, in light of Plaintiff's attendance problems during his first month of employment at Defendant's facility, *before* Defendant had imposed any conditions, it is clear that some accommodation was necessary in order for Plaintiff to achieve a satisfactory attendance record. Thus, the Court concludes that Plaintiff could not have satisfied the essential functions of attendance and punctuality without some sort of accommodation of his disability.

However, this conclusion does not end the matter, but instead leads to the second step of the "qualified individual" analysis: namely, whether Defendant's reasonable accommodation of Plaintiff's disability could have enabled him to satisfy the requirements of regular attendance and punctuality. Both parties apparently realized early in Plaintiff's tenure that some sort of accommodation would be necessary. Plaintiff testified at his deposition that in December, 1993, Tally declined to adopt two of Plaintiff's suggestions for accommodating his disability: that he be allowed to work late on the days on which he arrived late, and that his doctor be permitted to send notes by telefax. (Fritz Dep. at 45, 55).

Similarly, Defendant evidently recognized the need for accommodation by the time of the December 3, 1993, meeting between Plaintiff and Tally. By requiring a doctor's note each time Plaintiff arrived to work late, Defendant at least tacitly acknowledged that a diabetes-related problem would constitute an acceptable excuse for tardiness, rather than rendering Plaintiff completely unfit for the job. This acknowledgement is made explicit in Defendant's report of the April 11, 1994, meeting between Plaintiff and Tally; that report expressly exempts "late arrivals or absents related to Mr. Fritz's diabetes" from consideration as violations of Plaintiff's probation.

■■■■ The question becomes whether Defendant's various responses to Plaintiff's absences and tardiness qualify as "reasonable accommodations" of Plaintiff's disability. The Court finds that this question is incapable of resolution as a matter of law under the present record. As an initial matter, the Court notes that Defendant's stated bases for its motion for summary judgment do not include the claim that Defendant reasonably accommodated Plaintiff's disability. Moreover, whether an employer has reasonably accommodated an employee's disability is a question of fact that ordinarily should be resolved by a jury. *See Frye v. Aspin*, 997 F.2d 426, 428 (8th Cir.1993).

In addition, various deficiencies in the present record prevent this Court from determining whether Defendant attempted to reasonably accommodate Plaintiff's disability. First, because Defendant has chosen to pursue the broad claim that Plaintiff's absences render him not "qualified" as a matter of law, Defendant has not pointed to the facts necessary to support the more specific contention that Defendant indeed adopted various measures designed to accommodate Plaintiff's disability. Next, although Tally apparently realized that the doctor's note requirement might be counterproductive, the record indicates neither when this recognition occurred nor whether or when a new and less stringent requirement was imposed. Neither does the record indicate whether Defendant periodically revisited its attempts to accommodate Plaintiff's disability in light of Plaintiff's continued shortcomings in attendance and punctuality.

---

**4.** Apart from his own deposition testimony to this effect, Plaintiff also points to Tally's deposition testimony as revealing a "routine practice" of allowing employees to make up missed hours in the evenings or on weekends. However, Tally's testimony that "[t]here are occasions" when such flexibility is permitted, (Tally Dep. at 74–75), does not establish the further contention that such occasions arise "routinely."

Notwithstanding these deficiencies in the present record, Defendant would nevertheless be entitled to summary judgment upon showing that *no* reasonable accommodation would have enabled Plaintiff to achieve an acceptable level of attendance. The Court again finds, however, that this determination cannot be made as a matter of law at this juncture. Although Plaintiff has not shown that the job of CAD designer allows complete flexibility in working hours, neither has Defendant shown that the nature of Plaintiff's job flatly precluded the degree of accommodation his disability would have required. Moreover, the record does not reveal what percentage of Plaintiff's poor attendance was indeed attributable to his disability; thus, it is not possible to say whether any attempted accommodation could have sufficiently improved Plaintiff's attendance to render him "qualified."

In sum, in light of Plaintiff's clear attendance problems, the viability of Plaintiff's ADA claim turns on the question whether Defendant could have "reasonably accommodated" his disability, and thereby improved his attendance sufficiently to render him a "qualified individual." Unfortunately, the parties have largely ignored this issue, and have instead concentrated on the broader question whether Plaintiff has forfeited the protection of the ADA simply by virtue of his attendance record. Because this represents only half of the proper inquiry, and because the other half of the inquiry cannot be resolved as a matter of law under the present record, Defendant is not entitled to summary judgment on this ground.

## C. *Plaintiff's Poor Attendance Record Does Not Preclude Recovery Under the MHCRA.*

As this Court has previously noted, analysis of claims under the MHCRA largely parallels analysis under the ADA. *See Sherman v. Optical Imaging Systems, Inc.,* 843 F.Supp. 1168, 1180–81 (E.D.Mich. 1994). Specifically, the MHCRA, like the ADA, includes the notion of "reasonable accommodation." The Michigan act first defines a "handicap" as:

> A determinable physical or mental characteristic of an individual, . . ., if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position.

Mich.Comp.Laws § 37.1103(e)(i)(A). The MHCRA then provides that a handicap is "unrelated to the individual's ability" if, "with or without accommodation, an individual's handicap does not prevent the individual from . . . performing the duties of a particular job or position." Mich.Comp.Laws § 37.1103(1)(i).[5]

Because both the ADA and the MHCRA impose the duty to accommodate a disability, the Court's earlier discussion of this duty with respect to Plaintiff's ADA claim applies as well to Plaintiff's MHCRA claim. In particular, Plaintiff's status as either "qualified" under the ADA or "handicapped" under the MHCRA turns on the issue of accommodation. As earlier, the Court concludes that this issue cannot be resolved as a matter of law under the present record.

The parties evidently agree that the ADA's "qualified" language and the MHCRA's "handicapped" language call for largely identical analyses. As with Plaintiff's ADA claim, the parties have neglected to address the question whether Defendant satisfied its duty to accommodate under the MHCRA. Neither has Defendant pointed to facts sufficient to determine whether Plaintiff would have been unable to perform the job satisfactorily, and thus would not be "handi-

---

5. Although both the ADA and the MHCRA speak of "accommodation," the federal and state statutes appear to assign slightly different duties and burdens to the employer and employee. For example, the Michigan act requires a handicapped individual to request accommodation in writing before pursuing an MHCRA claim. Mich.Comp.Laws § 37.1210(18). In addition, the MHCRA expressly provides that the employee bears the burden of proof in a claim of failure to accommodate, and that such a claim will be defeated unless the employee successfully rebuts evidence from the employer indicating that a suggested accommodation "would impose an undue hardship." Mich.Comp.Laws § 37.1210(1). These differences, however, do not bear on this Court's resolution of Defendant's motion.

capped" under the MHCRA, even if his disability had been accommodated as called for under the MHCRA. Given these unresolved questions, Defendant is not entitled to summary judgment on Plaintiff's MHCRA claim on the ground that Plaintiff's poor attendance renders him not "handicapped."

### D. *The Present Record is Susceptible of the Inference that Defendant Imposed Conditions on Plaintiff's Employment Because of His Disability.*

■ As noted earlier, Plaintiff alleges three distinct types of discriminatory treatment by Defendant: unlawful discharges, altered terms and conditions of his employment, and a hostile work environment. In order to establish an ADA violation under any of these theories, Plaintiff must show that he was subjected to unlawful treatment "because of" his disability. *See* 42 U.S.C. § 12112 ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual."); *Maddox v. University of Tennessee,* 62 F.3d 843, 846 (6th Cir.1995) (stating, in a wrongful discharge case, that a plaintiff must show discriminatory treatment "solely by reason of his handicap"); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1106–07 (S.D.Ga.1995) (finding that an ADA-based hostile work environment claim, like the analogous claim under Title VII, requires a showing that the harassment was "based on the protected characteristic").[6] Similarly, in order to prevail in his MHCRA claim, Plaintiff must show that Defendant acted with discriminatory intent. *See* Mich.Comp. Laws § 37.1202(1)(b) (forbidding discrimination against an individual "because of a handicap"); *Sherman v. Optical Imaging Systems, Inc.,* 843 F.Supp. 1168, 1177 (E.D.Mich. 1994); *Crittenden v. Chrysler Corp.,* 178 Mich.App. 324, 443 N.W.2d 412, 415 (1989) (holding that, in order to prevail in a MHCRA claim, a plaintiff must show that

"discrimination was a determining factor in the defendant's conduct").

As its second basis for summary judgment, Defendant contends that its treatment of Plaintiff was motivated by its legitimate concern over Plaintiff's excessive absences, rather than by any improper consideration of his disability. Accordingly, Defendant argues that Plaintiff cannot establish the discriminatory intent necessary to prevail under either the ADA or the MHCRA. Plaintiff responds that because his absences were attributable to Defendant's prior discriminatory treatment, the two considerations of his absenteeism and his disability are inextricably intertwined.

The recent case of *Maddox v. University of Tennessee,* 62 F.3d 843 (6th Cir.1995), supports Defendant's attempt to distinguish a legitimate concern over excessive absenteeism from improper consideration of Plaintiff's disability. In *Maddox,* the plaintiff, an assistant football coach, was discharged after he was arrested for driving under the influence of alcohol. 62 F.3d at 845. The plaintiff argued that because he suffered from the disability of alcoholism, the discharge for a driving violation was tantamount to a discharge because of his disability. 62 F.3d at 846. The Sixth Circuit disagreed, and found that an employer may properly distinguish between an employee's misconduct and a disability that might have contributed to that misconduct. 62 F.3d at 847–48.

In so holding, the *Maddox* court disagreed with the Second Circuit's decision in *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511 (2d Cir.1991). In *Teahan,* the plaintiff claimed that the excessive absenteeism for which he was fired was solely attributable to his alcoholism. 951 F.2d at 515. The court found that, so long as the plaintiff's absenteeism and alcoholism truly were causally connected, the employer could not

---

**6.** This Court's research has uncovered no Sixth Circuit case recognizing a hostile work environment claim under the ADA. However, the ADA includes the same "terms, conditions, or privileges of employment" language cited by the Supreme Court in its recognition of a hostile work environment claim under Title VII. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 63–67,

106 S.Ct. 2399, 2404–06, 91 L.Ed.2d 49 (1986). Accordingly, some courts have concluded that hostile work environment claims are actionable under the ADA, and that the standards developed under Title VII case law govern such claims. *See, e.g., Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1106–07 (S.D.Ga.1995).

shield itself from liability by claiming that the plaintiff's absenteeism provided the lone justification for the discharge. 951 F.2d at 515–17.[7]

The *Maddox* court, however, rejected *Teahan's* reasoning that a causal relationship between an employee's disability and his misconduct renders those two considerations inseparable. *Maddox*, 62 F.3d at 847. The court found it untenable that an employer should be "forced to accommodate all behavior of an alcoholic which could in any way be related to the alcoholics's use of intoxicating beverages; behavior that would be intolerable if engaged in by a sober employee." 62 F.3d at 847. Thus, the court concluded that "[e]mployers subject to the ... ADA must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled." 62 F.3d at 848.

■ In light of *Maddox*, Defendant argues that the alleged causal connection between Plaintiff's diabetic condition and his absenteeism does not preclude Defendant from properly acting on the basis of Plaintiff's poor attendance record. This Court readily accepts the general proposition that an employer may properly distinguish between an employee's absenteeism and an employee's disability, despite the presence of a causal nexus between the two. The difficulty, however, lies in the facts of the instant case, at least as they are developed in the present record. Simply put, it is not sufficiently clear that Defendant did *in fact* act out of a legitimate concern for Plaintiff's absenteeism rather than an improper consideration of Plaintiff's disability.

As an initial matter, nothing in *Maddox* precludes this Court from inquiring whether Defendant in fact disregarded the potential distinction between Plaintiff's disability and his absenteeism. Rather, the *Maddox* court simply affirmed the district court's determi-

nation that, under the facts of that case, the employer had indeed properly distinguished between the employee's alcoholism and the misconduct for which he was discharged. *Maddox*, 62 F.3d at 846–47.

Moreover, three distinct features of that case lent credence to the employer's claimed ability to separate misconduct from an underlying disability. First, in *Maddox*, and in every case cited with approval by that court, the employee had engaged in serious, or even criminal, misconduct. 62 F.3d at 846–47. In recognition of this important fact, the *Maddox* court specifically held that the ADA permits employers to take appropriate action "*on account of egregious or criminal conduct*, regardless of whether the employee is disabled." 62 F.3d at 848 (emphasis added). Next, the court noted that the ADA expressly singles out alcoholism as a disability capable of being treated separately from related misconduct. 62 F.3d at 847–48. Finally, in rejecting the plaintiff's contention that his employer's stated reliance on the drunk driving arrest was a pretext for unlawful discrimination on the basis of his alcoholism, the *Maddox* court noted that the head coach and athletic director who fired the plaintiff had no prior knowledge of his alcoholism. 62 F.3d at 848; *see also Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir.1995) (finding that an employer who is unaware of an employee's disability cannot be held liable under the ADA).

Because none of these important features of *Maddox* is present in the instant matter, the Court finds that *Maddox* does not preclude careful scrutiny of Defendant's claim that Plaintiff's absenteeism was treated separately from his disability. In contrast to the drunk driving under consideration in *Maddox*, Plaintiff's absenteeism here is not "egregious or criminal conduct." Moreover, unlike the employer in *Maddox*, Defendant here clearly was aware of Plaintiff's disability when it imposed the allegedly discriminatory employment conditions on him. Because of

---

7. The court noted, however, that a plaintiff cannot prevail simply by establishing a causal connection between his absenteeism and his disability; rather, the plaintiff still must establish that he is "qualified." Stated differently, if an employer is faced with a alleged causal connection be-

tween an employee's disability and his deficient job performance, the employer can nevertheless defeat an ADA claim by showing that the employee, for whatever reason, could not perform the "essential functions" of the job. 951 F.2d at 515–16.

this knowledge, the Court cannot readily conclude that Defendant properly viewed Plaintiff's attendance problems in isolation from his disability.

Neither can the Court agree with Defendant's contention that the record is devoid of any evidence supporting the inference that Defendant acted out of improper consideration of Plaintiff's disability rather than legitimate consideration of his absenteeism. The deposition testimony of Clifton Tally lends some support to Plaintiff's contention that Defendant treated the two considerations as one. Reading Tally's testimony in a light most favorable to Plaintiff, the non-movant, it appears that Tally imposed the doctor's note requirement on Plaintiff based upon Tally's personal judgment, without apparent confirmation from medical authorities, that Plaintiff's claim of diabetes-related problems was not credible. Under this view of his deposition testimony, Tally did not act for reasons entirely independent from Plaintiff's disability. Rather, by treating Plaintiff's attendance problems as more likely attributable to delinquency than disability, Tally arguably made a deliberate decision to discount Plaintiff's claims of disability. Indeed, Tally testified at his deposition that he resented what he perceived as Plaintiff's misuse of his diabetic condition as an excuse for his poor attendance record. (Tally Dep. at 102–03).

This feature of this case admittedly introduces a difficulty not present in, for example, a Title VII discrimination case. Because of the types of discrimination prohibited under Title VII, and because of that statute's goal of ensuring that employment decisions are not based on improper consideration of an employee's protected characteristics, it would be nonsensical to bring a Title VII claim based on an employer's deliberate disregard of an employee's protected characteristic. In contrast, because the ADA imposes a duty to reasonably accommodate disabilities, an employer arguably has some motivation to deny the existence of a disability, thereby avoiding the burden of accommodating it. An employee bringing an ADA claim in such a case clearly could show that the employer failed to satisfy the duty to accommodate a legitimate disability. However, because the employer

in such a case has denied the very existence of a disability, the employee apparently would be unable to meet his burden of establishing that the employer acted "because of" the disability.

One court has suggested a way that the discriminatory intent element of an ADA claim can be established where an employer refuses to accept an employee's claim that his deficient job performance is attributable to his disability. In *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1100–01, 1108 (S.D.Ga.1995), an employee who had suffered a back injury brought an ADA claim, alleging that he was subjected to a hostile work environment because of his disability. The employer justified its treatment of the plaintiff as "being based not on [the plaintiff's] disability, but because he 'constantly complained, rarely worked his scheduled hours, overstated his physical complaints, and wanted to avoid work.'" 893 F.Supp. at 1108.

The court noted that the record was devoid of direct evidence, such as derogatory slurs, that would establish a link between the plaintiff's disability and the employer's actions. 893 F.Supp. at 1108. The court found, however, that the plaintiff need not produce such direct evidence to satisfy his burden of showing that the employer had acted "because of" his disability:

Based on the medical evidence submitted by Haysman, a jury might find that he was in fact not overstating complaints and that his absences were the legitimate result of severe pain. If so, a jury could infer that Food Lion personnel engaged in negative stereotyping of the disabled as people who overstate complaints, do not want to work, and 'milk' or 'snowball' their employers for benefits. A jury could find that [the plaintiff's supervisors] acted on this stereotype in deciding to 'ride' Haysman until he quit. Based on this possible inference, a reasonable jury could find that Haysman was harassed because of his disability.

Additionally, the justifications offered by Food Lion beg the question of whether the problems causing the alleged harassment were the direct results or symptoms of a legitimate disability of which Food Lion

had notice. An employer may reprimand recalcitrant employees whether disabled or not, but an employer is not free to harass or abuse a disabled individual over the direct consequences of his disability any more than the employer is free to call him a 'gimp' or other epithets.

893 F.Supp. at 1108–09; *see also* 42 U.S.C. § 12101(a)(7) (stating, as a finding in support of enactment of the ADA, that *individuals with disabilities have been* "subjected to a history of purposeful unequal treatment ... resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals").

Similarly, in the instant matter, the Court finds that the present record is susceptible of the inference that Defendant acted with the discriminatory intent or bad faith necessary to establish an ADA violation. In contrast to the situation under consideration in *Maddox*, the circumstances here do not give rise to a straightforward determination that, as a matter of law, Defendant viewed Plaintiff's absenteeism in isolation from his disability.[8] Rather, a jury could reasonably infer that Tally took an especially dim view of Plaintiff's attendance problems because of Tally's suspicion that Plaintiff was "misusing" his disability as an excuse. If, under further development of the factual record, Plaintiff can establish that his attendance problems were indeed due to his disability, and if

Plaintiff can further show that these problems could have been solved through reasonable accommodation by Defendant, then Defendant's failure to take appropriate steps to either verify the extent of Plaintiff's disability or reasonably accommodate it could constitute a violation of the ADA.[9]

At this stage of the litigation, this Court is unwilling to state a flat rule defining the degree to which Defendant must have considered Plaintiff's attendance problem separately from his disability in order to escape liability under the ADA or the MHCRA. *Maddox* indicates that Plaintiff cannot prevail simply by establishing a causal nexus between these two considerations; rather, Plaintiff must also show that Defendant's response to his attendance problem was improperly influenced to some degree by consideration of his disability. The Court concludes that an inference of such an improper influence could reasonably be drawn from the present record. Accordingly, Defendant is not entitled to summary judgment on the ground that it acted on the basis of Plaintiff's absenteeism rather than his disability.[10]

## V. CONCLUSION

For the foregoing reasons,

*Haysman*, 893 F.Supp. at 1109 n. 3 (citations omitted).

---

**8.** This is particularly true under the existing factual record. As noted earlier, the causal relationship—or, in Defendant's view, the *lack* of a significant causal relationship—between Plaintiff's disability and his absences has not been fully addressed by the parties in the instant motion.

**9.** As noted by the *Haysman* court, this view of the ADA's "because of" language does not impose strict liability upon an employer whenever it turns out that an employee's deficient performance is in fact attributable to a disability:

First, the employer must have knowledge of the disability. Second, the causal connection between the disability and the consequences relied on must be direct rather than remote. The disabled individual may not prevail merely by showing in hindsight that the actions relied on by the employer bore some minimal "but for" connection to the disability. Further, the employer may justify its action by pointing to reasons for its action which are unrelated to or remote from the individual's disability.

**10.** The Court emphasizes that this holding is dictated by the incomplete state of the record, rather than by any broader determination of what the ADA permits or forbids. In particular, the Court does not construe the ADA as forbidding an employer from taking measures based on its suspicion that an employee is improperly appealing to a disability as an excuse for deficient job performance. The ADA, however, does impose a certain risk on such a course of action. If the employer's suspicion proves unfounded, and if proper recognition of a legitimate disability would have enabled the employer to reasonably accommodate that disability, then the employer might well have violated the ADA. The Court, of course, need not resolve this question at this point in the instant litigation. Neither does the Court express any opinion whether Defendant's actions in the instant case are similar in any way to the above scenario.

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be DENIED.