**Joseph J. HOPKINS, Plaintiff–Appellant.**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION, Defendant–Appellee.**

No. 97–2071.

United States Court of Appeals, Sixth Circuit.

Argued: Dec. 9, 1998.

Decided and Filed: Nov. 15, 1999.

Patrick J. Burkett (argued and briefed), Sommers, Schwartz, Silver & Schwartz, Southfield, Michigan, for Appellant.

Lee J. Hutton, David A. Posner (argued and briefed), Duvin, Cahn & Hutton, Cleveland, Ohio, Raymond J. Carey, Mil-

ler, Canfield, Paddock & Stone, Detrroit, MI, for Appellee.

Before: WELLFORD, BOGGS, and MOORE, Circuit Judges.

WELLFORD, J., delivered the opinion of the court, in which BOGGS, J., joined. MOORE, J., delivered a separate dissenting opinion.

## OPINION

WELLFORD, Circuit Judge.

Plaintiff Joseph Hopkins began working for defendant Electronic Data Systems, Inc. ("EDS") as a Purchasing Agent in 1985. He was promoted to a management position after approximately six months, and just a year later was promoted to a higher-level management position. Hopkins also worked for EDS as a specialist in marketing and business planning. He was one of a few employees to be selected as a "business champion" for EDS to assist in developing entire product lines and business plans.

In early 1994, Hopkins was diagnosed with Adult Attention Deficit Disorder ("ADD") and shortly thereafter began taking medication to treat it. In April of 1994, Hopkins accepted a new position with EDS's Human Performance Services organization. He became a senior account manager in a program called Workforce Effectiveness. His supervisor at the time was Jean Roberts. In August of 1994, Paul Borrusch took over the supervisory responsibilities. The initial plan for Workforce Effectiveness was designed by another EDS employee, Bill Hitchcock, with whom Hopkins initially had limited contact.

Members of the Workforce Effectiveness program engaged in team-building exercises in order to establish trust. As part of one of those exercises, Hopkins disclosed to his co-workers that he had ADD. While Hopkins concedes that most fellow employees were sympathetic and concerned, Hitchcock allegedly did not share their concerns. Indeed, at one point, Hitchcock allegedly referred to Hopkins as "the mentally ill guy on Prozac that's going to shoot the place up." Hitchcock, however, adamantly denied making such a remark.

In late 1994, EDS formed a new department called Business Combinations. At that time, Hopkins' supervisor recommended that Hopkins be considered for a position in that department, and Hopkins transferred to the Business Combinations position. Hitchcock was the supervisor, and Jim Murphy was the only other person in that department.

In January of 1995, EDS management decided to cut its budget by 15%–25% in the area of sales and marketing. In early February of 1995, EDS made the decision to eliminate the Business Combinations positions held by both Hopkins and Murphy. During this time, Hopkins, who was having difficulty with his medication, was on a two-week leave of absence. On February 14, 1995, Hopkins and Murphy were notified of the elimination of their positions, but they were afforded the opportunity to find other positions within EDS for a period of sixty days. In addition, they were both advised that their salary and benefits would continue during this job search but would expire on April 15, 1995. Murphy found another position within EDS. Hopkins, on the other hand, was unsuccessful in finding another position, and his employment was terminated on April 15.

On October 18, 1996, Hopkins filed the instant lawsuit claiming that he was unlawfully discriminated against because of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Michigan Handicappers' Civil Rights Act ("MHCRA"), MCLA § 37.1101 *et seq.* He claims that EDS unlawfully transferred him to a position that was later eliminated and unlawfully failed to secure another position for him at EDS. He alleged that Hitchcock's

alleged derogatory comment about his taking Prozac demonstrated that defendant discriminated against him on the basis of his disability. In January, 1997, Hopkins added a cause of action under the Family and Medical Leave Act ("FLMA"), 29 U.S.C. § 2601 *et seq.*, but he has abandoned that claim on appeal.

In July of 1997, the defendant filed a motion for summary judgment. The court held a hearing on the motion the following September. On September 30, 1997, the district court granted the defendant's motion for summary judgment on all claims. Hopkins now appeals.

. We have delayed our disposition in this case because of our concerns regarding the adequacy of Hopkins' notice of appeal. At the time this case was argued, *United States v. Webb,* 157 F.3d 451 (6th Cir.1998) (per curiam), *cert. denied,* —— U.S. ——, 119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999), controlled the disposition of this issue. The panel in *Webb* held that because the appellant's notice of appeal "fail[ed] to designate the name of the court to which his appeal is taken, we must dismiss the appeal for lack of jurisdiction." *Id.* at 452. That holding, which drew considerable attention, interpreted Fed.R.Civ.P. 3(c), as amended:

> A notice of appeal must specify the party or parties taking the appeal by naming each appellant in either the caption or the body of the notice of appeal.... A notice of appeal also must designate the judgment, order, or part thereof appealed from, and must name the court to which the appeal is taken. An appeal will not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice.

*Id.*

Not long after *Webb* was decided, a majority of the active judges on the court voted to rehear the panel decision issued in *Dillon v. United States,* No. 97–3138 (6th Cir. Nov. 10, 1998) (unpublished),

which had dismissed an appeal based upon the *Webb* rationale. Ruling *en banc* on July 21, 1999, a majority of this court effectively overruled *Webb* in a circumstance where "the Sixth Circuit represented the only appellate court available to [the habeas corpus] petitioner." *Dillon v. United States,* 184 F.3d 556, 557 (6th Cir. 1999) (en banc). The court held that where a petitioner has only one possible choice of appellate forum, and he otherwise properly filed his notice of appeal in the district court that rendered the judgment, the notice of appeal is not defective by virtue of the petitioner's failure to name specifically the court to which he is directing his appeal. *Id.* Rather, under those circumstances, he is considered to have "named" the appellate forum in his notice. *See id.* at 559.

█ Hopkins' timely notice of appeal in the instant case did not name this court in his notice of appeal, but he listed the parties, the name of the district judge, the respective counsel, and contained a heading:

> UNITED·STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION CIVIL NO. 96–7480 DT

The content of the notice was brief: "Plaintiff, Joseph J. Hopkins, respectfully gives notice of his appeal from the Court's Judgment Opinion and Order (dated: 9/30/97) (copies attached hereto), granting Defendant's Motion for Summary Judgment." Filed with this appeal was a similar proof of service with no reference to the Sixth Circuit Court of Appeals.

Fortunately for Hopkins, we are no longer guided by *Webb,* but rather by *Dillon,* which called attention to Rule 3(c)(4), as amended: "An appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party...." Because this court is the only possible appellate forum for Hopkins, his "notice of appeal has the practical effect of 'naming' that forum." *Id.* at 558.

We find, albeit without enthusiasm under the circumstances, that we do have jurisdiction of this appeal.

## A. *Standard of Review*

This court reviews a district court's grant of summary judgment *de novo*. *See Schaffer ex rel. Schaffer v. A.O. Smith Harvestore Prods., Inc.*, 74 F.3d 722, 727 (6th Cir.1996); *White's Landing Fisheries v. Buchholzer*, 29 F.3d 229, 231 (6th Cir. 1994).

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

## B. *Was Summary Judgment Appropriate?*

■ In cases under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213,[1] in which the plaintiff alleges that he is the victim of discriminatory treatment, he may attempt to establish unlawful discrimination by introducing direct evidence of intentional discrimination, including evidence that the employer relied on the plaintiff's disability in making its employment decision. *See Terbovitz v. Fiscal Ct.*, 825 F.2d 111, 114–15 (6th Cir. 1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). Where there is no direct evidence of discrimination, a plaintiff can set out a prima facie case of handicap discrimination by establishing that (1) he is disabled; (2) he is otherwise qualified for the position; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) after rejection or termination, the position remained open, or the disabled individual was replaced by a member outside the protected class. *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir.1995). The fifth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Talley*, 61 F.3d at 1246.

■ If the plaintiff carries his burden of establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Monette*, 90 F.3d at 1179. Once the employer submits such evidence, the burden shifts back to the employee to establish that the employer's explanation is a mere pretext for unlawful discrimination. *Id.*

■ Hopkins alleges that the "Prozac" comment by Hitchcock was sufficient to show direct evidence of discrimination. He claims that the remark is "relevant to show his [Hitchcock's] attitude towards Mr. Hopkins and his predisposition to discriminate against him because of his handi-

---

1. Courts in this circuit have previously noted that "analysis of claims under the MHCRA largely parallels analysis under the ADA." *Fritz v. Mascotech Automotive Sys. Group, Inc.*, 914 F.Supp. 1481, 1491 (E.D.Mich.1996)

(citing *Sherman v. Optical Imaging Sys., Inc.*, 843 F.Supp. 1168, 1180–81 (E.D.Mich.1994)); *see also Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1178 n. 3 (6th Cir.1996).

cap." Plaintiff analogizes the alleged comment in this case to the racial slurs made against African–Americans by managers of a restaurant in *Talley, supra.* In *Talley,* evidence was presented that two owners of the defendant restaurant used racial slurs to denigrate African–Americans and to express an opinion about the limited nature of the work they believed that African–Americans were capable of performing. In that case, seven employees were fired; six were white and one was African–American. The six white employees were all rehired by the defendant, but the African–American was not. The Sixth Circuit reversed the district court's grant of summary judgment in favor of the employer, holding that the "plaintiff presented evidence that both [managers] had made racist comments which constitute direct evidence that plaintiff's termination may have been racially motivated." *Talley,* 61 F.3d at 1249. Thus, we concluded that the evidence was sufficient to overcome the defendant's argument that there was no direct evidence of discrimination. *Id.*

We are not persuaded that there is direct evidence of discrimination in this case. The isolated and ambiguous comment made by Hitchcock about "the guy on Prozac," assuming that such a comment was made, does not establish direct evidence of discrimination. *See LaPointe v. United Autoworkers Local 600,* 8 F.3d 376 (6th Cir.1993) (holding that "isolated and ambiguous statements . . . are too abstract, in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination") (quoting *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir. 1989)); *see also Cooley v. Carmike Cinemas,* 25 F.3d 1325, 1330 (6th Cir.1994); *Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993).

Indeed, one major difference between *Talley* and this case is that the evidence in

*Talley* showed that there had been repeated usage of racial slurs, whereas here there seems to have been only the one purported significant "slur" about Hopkins' handicap. The district court concluded that this particular comment, if made, cannot be "be interpreted as denigrating Plaintiff's job performance or suggesting that he either could not perform certain jobs or should only perform jobs of a lesser nature," and that "nothing in the comment can be interpreted as an expression of satisfaction at Plaintiff's misfortune of having the disability he claims to have." We agree with the district court's assessment and its conclusion that there was no direct evidence of discrimination in this case.

■ Hopkins also argues that he showed indirect evidence of discrimination, thus shifting the burden to the defendant to show a valid reason for the termination. As mentioned above, in order to show the existence of circumstantial evidence which creates an inference of discrimination, five factors must be shown. The first four factors are met by Hopkins,[2] but the fifth factor is more difficult. Hopkins cannot show that he was replaced by a person outside the class, which was a critical factor in the *Talley* decision.

Hopkins' argument rests on whether he can meet an alternative interpretation of the fifth factor: showing that similarly situated non-protected employees were treated more favorably. The person that was the most similarly situated to the plaintiff was Murphy, but the positions of both Murphy and Hopkins were eliminated at the same time.

Murphy and Hopkins' situations do differ, however, in that Murphy was able to find another position at EDS, but Hopkins was not. Hopkins argues that EDS's treatment of him after his termination constituted indirect evidence of discrimination.

**2.** It is important to note that for purposes of the summary judgment motion, defendant conceded that plaintiff's Attention Deficit Disorder qualified him for protection under the

Federal and Michigan statutes; that he was otherwise qualified for positions at EDS; and that EDS knew or had reason to know of his disability.

From our review of the evidence, however, we believe that the record shows that Murphy received substantially the same treatment as Hopkins after they were terminated. Both were denied direct access to E–TIPS (an internal on-line database of available jobs within the company), both did not receive any outplacement support, and neither were permitted on-site access to EDS' facility. Murphy was sent a small number of job listings from the E–TIPS system, none of which aided him in finding another position within the company. Murphy eventually found another job at EDS by using his own resourcefulness in calling a person he previously had known who was EDS' director of sales leadership. Hopkins had the same opportunity to find another person at EDS in the same manner as did Murphy, but he did not.

■ Furthermore, Hopkins cannot show that his transfer to the Business Combinations position was a "materially adverse" change in the terms of his employment. *See Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir.1996). In *Kocsis*, we held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id.* In the present case, it is undisputed that Hopkins received the same pay and benefits after his transfer as he had before. Hopkins cannot therefore establish that he received "significantly diminished" responsibilities in the transfer, though he no longer supervised the same number of people. Indeed, both positions were considered to be senior level management positions. Because Hopkins cannot establish that he suffered any materially significant disadvantage by reason of his transfer, he cannot rely on that transfer to establish a prima facie of discrimination.

■ Even if Hopkins were deemed to have established a prima facie case of discrimination, the defendant has articulated a legitimate, non-discriminatory reason for terminating Hopkins. "[I]f the employer offers a legitimate reason for its action that is unrelated to the plaintiff's disability, the plaintiff will bear the burden of establishing that the proffered reason is a pretext for unlawful discrimination." *Monette*, 90 F.3d at 1185–86. A plaintiff may establish pretext by showing (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the actions; or (3) that the proffered reason was insufficient to motivate the actions. *See Kocsis*, 97 F.3d at 883. "At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place." *Id.*; *see also Monette*, 90 F.3d at 1186–87.

EDS asserts that Hopkins cannot show that its articulated reasons for the transfer and subsequent termination were pretextual. Hopkins had agreed to transfer to the Business Combinations department after some problems and tensions arose between Hopkins and his co-workers. Moreover, with respect to EDS's assertion that Hopkins' and Murphy's positions were eliminated due to budget cutbacks and a reduction in force, Hopkins has submitted no evidence to show that the cutbacks were illegitimate or that they were fabricated in order to mask unlawful discrimination.

We agree that Hopkins has not presented any evidence to support a claim of pretext. For example, he does not argue that the proffered reasons for his termination—budget cutbacks—had no basis in fact, or that EDS prevented him from obtaining another position with the company after his position was eliminated. Though Hopkins claims that he was denied access to opportunities for other positions within EDS, he does not put forth evidence to show that he was treated any differently from Murphy with respect to finding a new position after their's had been eliminated.

■ In addition, in *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir.1990), this court held that "a statement by an intermediate level management official is not indicative of discrimination when

the ultimate decision to discharge [is] made by an upper level official." It is clear that Hitchcock was only one of a number of individuals involved in the process leading to the elimination of the Business Combinations positions. There is, therefore, no direct causative connection between Hitchcock's alleged statement and the events leading to Hopkins' termination.

This court has held previously that "[t]he guiding principle is that the evidence must be sufficiently probative to allow a fact-finder to believe that an employer intentionally discriminated against the plaintiff because of [the plaintiff's membership in a protected class]." *Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1466 (6th Cir.1990). For the reasons stated, Hopkins cannot establish a prima facie case of employment discrimination. In particular, he cannot establish that his transfer to the Business Combinations department was an adverse employment decision, or that the transfer was due to his disability. Also, he has not submitted sufficient evidence to show that his termination and subsequent inability to find another position with EDS were based on his disability. Furthermore, even if he could establish a prima facie case of discrimination, we would find that EDS carried its burden to articulate a legitimate non-discriminatory reason for its actions, and that Hopkins has not submitted sufficient evidence to show that the articulated reasons were pretextual.

The dissent relies to a considerable extent on the rationale in *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344 (6th Cir.1998), an opinion authored by the dissenter. We observe that *Ercegovich* involved very different circumstances in its discussion about age-based discriminatory treatment of a terminated plaintiff.

We believe that *Ercegovich* is distinguishable from the instant case. First, in *Ercegovich*, the plaintiff was terminated as a result of a corporate restructuring and down–sizing. Two other younger and allegedly comparable persons were trans-ferred to different positions. In the instant case, the similarly situated coworker was Murphy, who was treated in the same way as Hopkins. Also in *Ercegovich*, the plaintiff alleged that there were "numerous" discriminatory comments by supervisors, superiors, and "individuals occupying high positions," indicating "a cumulative managerial attitude." *Ercegovich,* 154 F.3d at 354, 356. Those persons apparently "participated closely" or played an important role in the plaintiff's termination. In contrast, Hopkins asserts only a single isolated remark by one person in a supervisory role (which was disputed by EDS). Also, in *Ercegovich*, the remarks were made very shortly before the plaintiff was terminated. In this case, the isolated remark was made a longer period before Hopkins terminated his employment.

The result in *Ercegovich* (the reversal of summary judgment in favor of the employer) is understandable under those very different circumstances. We are not persuaded, however, that the result in that case requires the same result here. We reiterate the basic principle expressed in *Ercegovich:* "[A]n employer is under no obligation to transfer to another position in the company an employee where whose position has been eliminated." *Id.* at 351. We agree with *Ercegovich* that a plaintiff can succeed only if he can demonstrate purposeful discrimination in not being offered an opportunity to transfer to an available position for which he is qualified. To establish such a claim, *Ercegovich* recognizes that comparisons must be made to persons "similarly situated in all of the relevant aspects." *Id.* at 352; *see generally Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994); *Mitchell v. Toledo Hospital,* 964 F.2d 577 (6th Cir. 1992). Hopkins has not made such a showing in this case. There was simply—unlike in *Ercegovich*—no indication of a "discriminatory corporate culture" at EDS, nor was there a "discriminatory atmosphere" nor any hostile "cumulative managerial attitude" against Hopkins. *See id.*

at 356, 357. Rather, there was an alleged "off-hand comment" by a single manager. *See id.* at 356. Therefore, we respectfully disagree with the dissent's position that *Ercegovich* requires a different result.

In light of the foregoing, we conclude that the district court was correct in granting summary judgment to defendant EDS, and we accordingly **AFFIRM**.

MOORE, Circuit Judge, dissenting.

The majority holds that Joseph Hopkins failed to establish a prima facie case of discrimination based on his transfer to the Business Combinations department and ultimate termination. Moreover, the majority concludes that even if Hopkins could meet his burden, EDS provided a legitimate, non-discriminatory reason for its actions which Hopkins did not show to be pretextual. Because the majority does not consider EDS's refusal to provide Hopkins with access to E–Tips and other placement services as a basis for discrimination, I respectfully dissent.

Hopkins may establish a prima facie case of discrimination by showing that: (1) he is disabled; (2) he is otherwise qualified for the position; (3) he suffered an adverse employment action; (4) EDS knew or should have known of his disability; and (5) after he was rejected or terminated, the position remained open or was filled by another person. *See Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996). As the majority notes, EDS conceded that Hopkins is disabled, Hopkins is otherwise qualified for positions at EDS, and EDS knew or had reason to know of his disability. With respect to the third factor, Hopkins suffered an adverse employment action because he was denied the opportunity to use E–Tips and other placement services to find another position within EDS. *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 351 (6th Cir.1998) (denial of opportunity to transfer to another position within a corporation after position was eliminated constituted a basis for maintaining age discrimination

suit). Access to E–Tips, an internal data base containing up-to-date information on hundreds of positions, was crucial in discovering open positions within EDS. Finally, the positions described in E–Tips, to which he was denied access, were open. Hopkins thus met his burden of making a prima facie case of discrimination based upon EDS's denial of access to E–Tips and other placement services.

The burden of production then shifted to EDS to prove a legitimate, non-discriminatory reason for its actions. *See Monette,* 90 F.3d at 1186. EDS claims that it had no duty to provide Hopkins with access to E–Tips and that it had no standard practice of giving terminated employees access to its placement services. *See* J.A. at 164–65 (Hitchcock Dep.); 190–91 (Ford Dep.). In addition, EDS asserts it did not treat Hopkins differently than other similarly situated, non-protected employees. As an example, EDS points to its treatment of Jim Murphy, a non-protected employee, who worked with Hopkins in the Business Combinations department and had similar responsibilities to Hopkins. Murphy also was denied access to E–Tips and other placement services after his position in the department was eliminated. Because EDS refused to provide both Hopkins and Murphy access to its placement services and treated them similarly, EDS claims its actions could not have been based on a discriminatory motive.

Hopkins, however, submitted evidence that EDS's reasons for refusing to give him access to E–Tips and other placement services are pretextual. First, he asserts the reasons have no basis in fact because EDS's standard termination procedure was to provide access to its placement services. EDS is a dynamic company that is constantly restructuring. *See* J.A. at 499 (Hopkins Dep.). It has at least one employee whose entire job appears to be helping people whose departments are eliminated find new positions. *See* J.A. at 538 (Hopkins Dep.). Hopkins stated that when an employee who was performing

well was terminated, EDS would allow that employee to find another position at EDS through its E–Tips and other placement services. "It would become that employee's full-time job to find another job" for a month or even close to a year. J.A. at 496 (Hopkins Dep.). Hopkins himself had been able to take advantage of these services after his eight-person department was dissolved in 1993. *See* J.A. at 534 (Hopkins Dep.). In addition, Murphy similarly stated that when a successful employee's position was terminated, he or she was usually allowed to use his or her desk, telephone, computer, e-mail, and E–Tips for a period of up to sixty days to find another position within EDS. *See* J.A. at 622–23 (Murphy Dep.). In Hopkins's termination meeting, Justin Ford and William Hitchcock explained that his department was being eliminated because of budget cuts and assured him that they had no problems with his performance or attitude at work. *See* J.A. at 593 (Hopkins Dep.). Nonetheless, he was denied access to E–Tips and told not to look for another position within the company. *See* J.A. at 593 (Hopkins Dep.). EDS responds that Hopkins and Murphy, a non-protected employee, were similarly situated employees and both were denied access to EDS placement services. However, Murphy had a personal conflict with Ford, one of the department's managers, who had shown hostility toward Murphy and told him "[w]e don't want you around here." J.A. at 625 (Murphy Dep.). Thus, the evidence shows that EDS departed from its standard termination policy and denied both Hopkins and Murphy access to E–Tips and other placement services because of managerial hostility—toward Hopkins because of his Adult Attention Deficit Disorder ("ADD") and toward Murphy because of a personal grudge.

In addition, Hopkins's claim that he was denied the opportunity to use EDS's placement services to find another position because of his disability is supported by *Hitchcock's derogatory comments about his disability.* In evaluating the relevancy of discriminatory remarks, this court examines the identity of the speaker and the substance of the remarks. *See Ercegovich*, 154 F.3d at 354–55. If the comments were made by a person in a position to influence the alleged employment decision, they will be relevant unless they are so isolated and ambiguous as to be nonprobative. *See id.* at 355. Hitchcock was Hopkins's direct supervisor in the Business Combinations department and was responsible for helping him find another position within EDS. *See* J.A. at 538–39 (Hopkins Dep.). Hitchcock, however, expressly denied Hopkins access to E–Tips and specifically discouraged him from looking for another job at EDS, telling him "[d]on't waste your time looking internally." J.A. at 497–98, 593 (Hopkins Dep.). Thus, Hitchcock was in a position to decide whether Hopkins would have access to EDS's placement services. Throughout late 1994 and early 1995, Hitchcock made derogatory, joking comments about Hopkins's ADD. *See* J.A. at 521 (Hopkins Dep.). On one occasion in 1995, Hitchcock referred to Hopkins as "the mentally ill guy on Prozac that's going to shoot the place up." J.A. at 524 (Hopkins Dep.). Hitchcock's comments were not isolated and were made within months of Hopkins's termination and the subsequent denial of placement services.[1] Hitchcock's

---

1. The majority claims Hitchcock made a single isolated remark long before Hopkins was terminated. The majority is incorrect because Hitchcock's remarks were both numerous and in close proximity to Hopkins's termination. In his deposition, Hopkins stated that Hitchcock made comments "about [Hopkins] being mentally ill" on "[n]umerous occasions" in "late '94, early '95." J.A. at 521 (Hopkins Dep.). He also stated specifically that Hitchcock referred to him as "the mentally ill guy on Prozac that's going to shoot the place up" sometime between "January of '95 and February of '95." J.A. at 523–24 (Hopkins Dep.). The majority correctly notes that Hopkins was terminated from EDS in February 1995. Therefore, there is evidence that Hitchcock made numerous derogatory comments about Hopkins's disability, includ-

characterization of Hopkins showed that he questioned Hopkins's mental stability and competency because of ADD; the comments were unambiguously derogatory. Although Hitchcock denies making any remarks about Hopkins's condition, a reasonable juror could examine all of the evidence and conclude otherwise.

Based on the evidence that EDS deviated from its standard termination procedure for good employees and that Hitchcock made several derogatory comments about Hopkins's condition, a genuine issue of material fact exists whether Hopkins was denied access to E–Tips and other placement services because of his disability. For the foregoing reasons, I believe Hopkins's case should have been submitted to a jury and respectfully dissent.

ing the particular comment quoted above, in

the few months before his termination.