NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0778n.06
Filed: December 22, 2008

07-6134

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KENNETH CLACK, )
)
    Plaintiff-Appellant, )
)
v. ) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
ROCK-TENN COMPANY and ROCK- ) EASTERN DISTRICT OF TENNESSEE
TENN COMPANY, MILL DIVISION, )
)
    Respondents-Appellees. )

Before: DAUGHTREY and MOORE, Circuit Judges; DUGGAN,[*] District Judge.

**PER CURIAM.** The plaintiff, Kenneth Clack, appeals from the order granting summary judgment to the defendants, Rock-Tenn Company and Rock-Tenn's Mill Division, that was entered on Clack's claims that his termination constituted racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The magistrate judge, sitting as the district court by consent, held that Clack had established a *prima facie* case of race discrimination but had failed to show that the defendants' purported reason for the termination, Clack's insubordination, was a pretext for

---

[*]The Hon. Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

either racial or retaliatory animus. We find no basis on which to overturn the summary judgment order and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In February 2005, at the time of the events giving rise to this litigation, Kenneth Clack, an African-American male, had been employed at Rock-Tenn's Chattanooga facility as a line worker in the company's recycled paperboard plant since 1986. During the early years of his employment, Clack apparently had little difficulty with the company's management but beginning in 1995, his relationship with his supervisors grew increasingly contentious. According to the record, over the next decade Clack filed some 15 or more grievances with his union steward. One or two of those complaints alleged non-specific "harassment." In two others, Clack made reference to a supervisor who "ha[d] a skin problem" and complained about a racial slur, although the record does not reflect its source. The other grievances concerned disagreements about work assignments, use of safety equipment, scheduling difficulties, and the like. As summarized by the defendants, they do not explicitly reflect racial hostility or animus as a basis for Clack's complaint.

In 1998, Clack filed an EEOC complaint, and later a lawsuit, against the defendants contending that he had been subject to racial harassment for a number of years, and in 2000, Clack and Rock-Tenn entered into a confidential agreement settling the case. In

2003, Clack filed both a grievance with his union accusing Rock-Tenn's general manager, Walter Lancaster, of harassment and retaliation relating to his 1998 lawsuit and a second EEOC complaint based on Lancaster's alleged harassment and retaliation. There is no indication in the record that this complaint became the subject of a lawsuit.

In November 2004, Clack filed a union grievance against his immediate supervisor, foreman Bill Murphy, accusing him of "telling lies against [him] and mak[ing] threatening statements to [him]." At an internal meeting in December 2004 to discuss this grievance, Clack indicated that he believed that Murphy was retaliating against him because of his previous EEOC complaints. In response, Lancaster told Clack that if he felt that Murphy was harassing him, he should report it to Mike McDougal, the plant superintendent. Clack later maintained that he was instructed to contact Mike McDougal "immediately" rather than "wait until a break." By contrast, Lancaster insisted that he did not state or even imply that Clack could stop work or refuse work in order to contact McDougal.

The specific event that led to this litigation occurred on February 1, 2005. Murphy, who was the foreman on duty, instructed Clack to clean up some debris that had fallen near the machine Clack was working on. Clack testified that as the "filler-man" on the machine, it was his job to feed material into the machine and keep his immediate area clean and that the "utility man" assigned to the machine was responsible for general clean-up around the machine. Clack also claims that the "utility man" on duty that day, Denny Wooten, was standing nearby watching Murphy and Clack's interaction. Clack apparently decided that

Murphy's instruction constituted harassment, both because he was being asked to do the job of another employee and because earlier in the day, according to Clack, Murphy purposefully bumped into him while walking past him. Clack therefore informed Murphy that it was not his job to clean up the debris in question and that, in any event, he did not have the correct machinery, a certain kind of forklift, to do the job. When Murphy insisted that Clack complete the task, Clack left the area, telling Murphy that he was going to go call McDougal. Murphy apparently instructed Clack to call his union representative instead because Murphy had already determined that he was going to send Clack home for insubordination. After Clack was sent home, Wooten and another employee accomplished the clean-up task in a few minutes using implements available on the shop floor.

The day after the incident, management had a meeting with Clack to get his side of the story. After further investigation, Lancaster fired Clack for insubordination, an action punishable by termination even for a first offense under the terms of the prevailing collective bargaining agreement. Lancaster said that he made the final termination decision based on McDougal's recommendation. Murphy, whose position as foreman was considered non-managerial, apparently had the authority to suspend but not terminate employees. There is no evidence in the record that Murphy was personally involved in the termination decision.

Clack filed a grievance regarding his termination and, after arbitration, was reinstated with back pay, based on the arbitrator's determination that there were "mitigating circumstances" relating to Clack's failure to follow Murphy's directions. Subsequently, Clack

filed the instant action claiming that his termination constituted racial discrimination and retaliation in violation of Title VII. The district court granted summary judgment to the defendants, holding that although the plaintiff established a *prima facie* case of both discrimination and retaliation, he had not demonstrated the defendants' stated reason for termination – insubordination – was pretextual.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc.*, 339 F.3d 428, 433 (6th Cir. 2003). Summary judgment is appropriate where "there is no genuine issue as to any material fact and... the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Once the moving party has sufficiently informed the district court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate, and they must do more than simply show that there is some metaphysical doubt as to the material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Matsushita*, 475 U.S. at 586. The mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient; rather, the plaintiff must come forward with affirmative evidence upon which a rational jury could find for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 252, 256-57 (1986).

**Race Discrimination**

The plaintiff claims that his termination constituted discrimination based on his race, in violation of 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of race discrimination, the district court determined, under the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), that the plaintiff had established a *prima facie* case through circumstantial evidence. That determination is not seriously contested on appeal.[1]

The plaintiff having established a *prima facie* case, the burden of production then shifted to the defendant to articulate a non-discriminatory reason or reasons for the adverse employment action. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). Rock-Tenn contends on appeal that it discharged this burden by establishing a non-discriminatory reason for Clack's termination – his insubordination – and that the plaintiff cannot show that its proffered reason for the action was pretextual. In response, the plaintiff provides a lengthy discussion of factual circumstances that he contends show pretext, including Murphy's alleged ongoing harassment, Murphy's mishandling of the incident at issue, Clack's contention that he was not in fact insubordinate, and management's alleged

---

[1]On appeal, the defendants argue that one of the *McDonnell Douglas* prongs – that a person outside the protected class was treated more favorably than the plaintiff or that he was replaced by a person outside the protected class – was not proven. This contention is based on the argument that "Rock-Tenn did not intentionally replace Plaintiff with a white employee, but that the terms of the CBA required that the next person with seniority fill that position and such person happened to be white." As the magistrate judge noted, however, the defendants provided no authority for this proposition, and we have found none.

"historic lack of investigation" into his grievances. However, none of the evidence he offers in support of his argument, save for one affidavit, directly addresses the issue of racial animosity in connection with the decision to fire Clack.

The crucial affidavit is from Ted Bonine, a former foreman at Rock-Tenn who worked with Murphy from 1999 until approximately 2002. In it, Bonine recalled observing Murphy make racists remarks and single out black employees, including Kenneth Clack, for harsher treatment based on race. He also indicated that the management was generally aware of Murphy's racism and tolerated it.[2]

---

[2]The affidavit reads in relevant part:

> Repeatedly throughout my employment, Mr. Murphy used offensive slurs toward black employees, calling them "niggers" and "Black mother fuckers."

[He] repeatedly expressed his opinion that the black employees were generally lazy and "Good for nothing" . . . . As a general rule, Mr. Murphy would always treat the African American employees more harshly than white employees in almost every nuance of the job. [He] also seemed to single out Mr. Kenneth Clack for his racially based rage. [He] was aware of the outcome of Mr. Clack's previous lawsuit and spoke of it on several occasions. It seemed to make him angry. On one occasion I went with Mr. Murphy to Norcross, Georgia for training. During that trip, Mr. Murphy repeatedly spoke of Mr. Clack on a racially offensive level. Both on the above trip and at other times, Mr. Murphy made the comments "KC is nothing but a fucking nigger" and "I am going to get rid of him." Mr. Murphy also referred to Mr. Clack as a "black mother fucker." On one occasion in 2001, Mr. Murphy made the comment that he was going to throw Mr. Clack in the pulper and make him into paper. On another occasion, Mr. Murphy stated he wanted to "string him up." I complained to management about Murphy but to my knowledge nothing was done about it. It was my observation, experience and belief that Murphy's general attitude and feelings were known throughout the facility. As a foreman, I believe that I respected all of the employees and felt that I had a good relationship with the black employees. This made Mr. Murphy angry and he commented that I was too friendly with the black employees. He would also become angry when I would defend a black employee or ask him to stop his offensive language.

The magistrate judge disregarded the Bonine affidavit because "the statements do not show racial animus by the decisionmaker at the relevant time." The court reasoned that the statements attributed to Murphy were not relevant because they were "far removed, at least three years and possibly more, from the period immediately surrounding the events in February 2005" and, moreover, that "[e]ven assuming that Murphy had racial animus toward black employees and Plaintiff in particular, he was not the decisionmaker" and "Lancaster, who was the decisionmaker, was aware of the history between Murphy and Plaintiff and no evidence has been presented of any racial bias or comments of Lancaster."

On appeal, the defendants ask us to go a step further and conclude not only that the statements recounted in Bonine's affidavit are irrelevant but also that they are time-barred under the statute of limitations because Clack's claim of racial discrimination is based upon a discrete act, rather than a continuing violation. However, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) the Supreme Court explicitly held that in Title VII cases claiming a violation based on a discrete act of discrimination, a plaintiff is not prevented from using otherwise time-barred incidents as "background evidence in support of a timely claim." Here, Clack is not attempting to recover based on Murphy's past statements but, as explicitly allowed by *Morgan*, is simply using them as background evidence to prove pretext. *See Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 786, n.4 (7th Cir. 2004) ("The district court concluded that because certain events cited by Davis occurred outside the 300 days from the date he filed his . . . charge. . . they could not be relied upon as evidence of pretext. However, the Supreme Court has made clear in

. . . [Morgan]. . . that where, as here, the plaintiff timely alleged a discrete discriminatory act (*i.e.*, his termination based on his race and in retaliation for filing prior charges), acts outside of the statutory time frame may be used to support that claim.").

Turning to an evaluation of the statements, we have held that "[u]nless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Noble v. Blinker Int'l., Inc.*, 391 F.3d 715, 724 (6th Cir. 2004) (internal quotations, citation, and alterations omitted). Thus, "[i]n evaluating the relevancy of discriminatory remarks" as part of a pretext analysis, "this court examines the identity of the speaker," as well as "the substance of the remarks." *Hopkins v. Electronic Data Sys. Corp.*, 196 F.3d 655, 665 (6th Cir. 1999). Moreover, we have noted in conducting such an analysis that

> [a]n isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of . . . discrimination. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[S]tatement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."). This court later explained, however, that the *McDonald* rule was never intended to apply formalistically, and that remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a *meaningful role* in the decision to terminate the plaintiff, were relevant. *See Wells [v. New Cherokee Corp.]*, 58 F.3d [233,] 237-38 [6th Cir. 1995)]. . . . Similarly, the discriminatory remarks of those who may have *influenced* the [personnel decision] . . . may be relevant when the plaintiff challenges the motive behind that decision.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998) (emphasis added); *see also Noble*, 391 F.3d at 723 (opinions or attitudes of the non-decision-maker

must "influence[]" or "otherwise cause" the discharge); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (protected trait "must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome") (internal quotations and citation omitted; alternation in original). We have further expounded upon the rationale behind refusing to employ a "formalistic" application of the *McDonald* rule:

> If we applied the rule rigidly, employers could simply create a post for the manager in charge of firing employees and isolate that person so that he or she never met the unlucky employees. Supervisors with no official authority to discharge would effectively make firing decisions before informing this manager, who would then act on the decisions, and the employer would not be liable even if the supervisors admitted discrimination. Companies may not so easily insulate themselves from liability for discriminatory discharges.

*Wells*, 58 F.3d at 238; *see also Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th Cir. 2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this court has held that the employer may be held liable under a "rubber-stamp" or "cat's paw" theory of liability. . . . [T]he term 'cat's paw' refers to one used by another to accomplish his purposes.") (internal quotations and citations omitted). In sum, "[i]f the comments were made by a person in a position to influence the alleged employment decision, they will be relevant unless they are so isolated and ambiguous as to be nonprobative." *Hopkins*, 196 F.3d at 665. The timing of any remarks, specifically how remote in time they were to the employment action at issue, also has bearing on their

relevance. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (discounting allegedly ageist comments made by plaintiff's supervisors that were "remote in time.")

In this case, the substance of Murphy's remarks and purported actions are certainly indicative of animus based on race. As the defendants appear to concede on appeal, the objectionable statements are not isolated nor ambiguous. Moreover, we are not convinced that the district court was correct in holding that the time lag here was dispositive. Even though Bonine observed Murphy's behavior approximately three years prior to Clack's termination, viewing the record in a the light most favorable to the plaintiff, we find nothing to suggest that such a significant level of racial hostility would have been dispelled merely by the passage of time.

The more pertinent question is whether Murphy's racist attitude "influenced" or "otherwise caused" the undisputed decision maker, Lancaster, to terminate Clack. Although Clack asserts in his brief that Murphy had "significant involvement in the decision to terminate Appellant," there is not much in the record to support this statement. There is no indication on the record that Murphy was included in discussions regarding the termination or had any kind of say in the ultimate decision. It is undisputed, as the plaintiff points out, that Murphy filed a written report on the incident that was given to management, but it is also undisputed that management held a meeting in which Clack was given the opportunity to present his side of the story and that Lancaster made the decision to terminate the plaintiff only after hearing his version of events at this meeting. Moreover, Lancaster

explained that in his opinion, unlike being instructed to do something far outside of his job description, such as cleaning the toilets, the job of cleaning the debris near the machine was sufficiently within Clack's job responsibility that it was insubordinate not to comply with Murphy's direction and, instead, walk off the floor to call McDougal. Lancaster took the not unreasonable position that Clack should have completed the task as instructed and raised the issue with McDougal at a later point, if necessary.

The record suggests that Rock-Tenn's upper management knew of animosity between Clack and Murphy and may have known that Murphy had made hostile, racist comments about Clack, if not directly to him. That knowledge alone is not sufficient *per se* to support the conclusion that Murphy influenced Lancaster's ultimate decision to terminate Clack's employment. Lancaster's testimony regarding his reasoning for the termination indicates that Lancaster engaged in an independent investigation and made a decision based on that investigation. A number of cases from this court suggest that this is enough to sterilize the termination from the taint of Murphy's racial animus. In *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 946 (6th Cir. 1992), for example, we held that a direct supervisor's racial animus could not be imputed to a manager who made the ultimate termination decision when the supervisor reported the incident in question but the termination decision was based on management's independent investigation. Likewise, Murphy's role in this case appears to be limited to reporting the incident, permitting Lancaster to form his own conclusions after hearing Clack's version of events.

Clack cites *Ercegovitch v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), in support of his argument that Murphy's racial bias should be imputed to higher-ups in the company. That case, however, is distinguishable on its facts. In *Ercegovitch*, several individuals occupying high positions in Goodyear's hierarchy, including the vice president overseeing the entire division at issue, had made ageist remarks. We found that there was a material question of fact regarding whether the vice president, who was "involved in some parts of the discussion" regarding the adverse employment action was "in a position to influence" the decision. *Id.* at 355. We also found that the vice president was "in a position to shape the attitudes, policies, and decisions of the division's managers" including the ultimate decision makers, and moreover, that ageist comments by several other members of senior management suggested the possibility of a "discriminatory atmosphere at the defendant's workplace" that could "in turn . . . serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* at 355-56. In the case at hand, by contrast, there is no indication that Murphy held an analogous position of influence or that he took part in any discussions regarding the termination decision, nor did Clack offer evidence that members of upper management had made racist comments sufficient to create an inference of an overall "discriminatory atmosphere" emanating from the top.

Finally, we conclude that the magistrate judge did not err in rejecting Clack's claim that he was not actually insubordinate but rather was simply doing what he was told, *i.e.,* attempting to contact McDougal if he felt harassed. As we have previously explained, "so long as the employer honestly believed in the proffered reason given for its employment

action" and that honest belief is "reasonably grounded on particularized facts that were before it at the time of the employment action," a plaintiff "cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). Of course, a purported error "too obvious to be unintentional" may indicate pretext. *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Nevertheless, "arguing about the accuracy of the employer's assessment is [merely] a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Smith*, 155 F.3d at 806 (internal quotations and citation omitted). Here, although there may be some room to argue that Clack's actions were not insubordinate, a conclusion later reached in hindsight by the arbitrator, Lancaster's conclusion that Clack was insubordinate in leaving his station to call McDougal, rather than performing the assigned task before contacting McDougal, is certainly not "obvious" error, and there is nothing in the record to suggest discriminatory intent on Lancaster's part. As for Clack's assertion that he was told to call McDougal immediately if he felt harassed by Murphy, the facts viewed in the light most favorable to the plaintiff suggest at most that there was a misunderstanding between Lancaster and Clack regarding whether he could stop work to make such a call or, on the contrary, whether he should wait for a more appropriate time, especially given that Murphy's direction was not unreasonable. In any event, Lancaster's interpretation of the facts that he drew from his investigation of the incident is not so irrational or obviously erroneous that one must conclude that it is

dishonest. Even the arbitrator noted that the "best path" for Clack to have followed would have been to "comply and grieve later."

**Retaliation**

For the same reason that Clack cannot establish that his termination was the result of racial discrimination, he has also failed to establish that he was fired in retaliation for activity protected by Title VII, 42 U.S.C. § 2000e-3(a). In the absence of any direct evidence of retaliation, Clack initially presented circumstantial evidence to establish a *prima facie* case of retaliation through the *McDonnell Douglas* burden-shifting framework. After a detailed analysis of the facts, the district court noted the temporal proximity between a December 2004 meeting held to discuss the merits of a formal grievance that Clack had filed in November 2004 and his eventual termination in February 2005 on other grounds, and held that the relatively short period of two months was sufficient to establish a *prima facie* case of retaliation.

Nevertheless, as with his claim of racial discrimination under the *McDonnell Douglas* framework, once the plaintiff established a *prima facie* case, the defendants could and did provide a non-discriminatory reason for Clack's termination, thereby refuting the charge of retaliation. It was then up to the plaintiff to show that the basis for the adverse employment decision was merely a pretext for retaliation. *See Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005). The district court determined that the plaintiff had failed to establish pretext,

and we agree with this conclusion. On appeal, Clack does not distinguish the evidence proffered to establish pretext for racial discrimination from that he now relies upon to show pretext for retaliation. Specifically, he reiterates a number of factual circumstances, including – as we previously noted – Murphy's alleged ongoing harassment, Murphy's mishandling of the incident at issue, Clack's contention that he was not in fact insubordinate, and management's alleged "historic lack of investigation" into his grievances. As with his racial discrimination claim, however, the flaw in Clack's argument is that only a few pieces of evidence arguably relate directly to the alleged retaliation, and that proof is much less substantial and less relevant than the evidence of racial animus reflected in the Bonine affidavit.

There is scant other evidence of retaliatory motive unrelated to Murphy. For example, an affidavit from union representative Danelle Rogers indicates that, after Clack was terminated, "Murphy seemed very happy," that "[h]is reaction was not consistent with a regular termination," and that Murphy stated that he had "finally got rid of [Clack]." Another Rock-Tenn employee, Tommy Earvin, echoed Rogers's observation, repeating in an affidavit Murphy's statements "I got the hammer" and "I got him," referring to Clack. But, as noted above, Murphy was not the Rock-Tenn employee in a position to take retaliatory action against Clack, at least not in the form of ordering his termination. That person was Lancaster, and although the plaintiff points out that Lancaster admitted in his deposition that Clack's filing of an earlier grievance against him "bother[ed]" him, this admission, standing alone, is insufficient to establish retaliation by Lancaster by more than a mere scintilla of

evidence. It is clearly not sufficient to take the issue to a jury. *Anderson*, 477 U.S. at 256-57.

## **CONCLUSION**

For the reasons set out above, we AFFIRM the district court's grant of summary judgment.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority holds that Rock-Tenn provided a legitimate, non-discriminatory reason for its termination of Kenneth Clack—insubordination—which Clack did not show to be pretextual. Specifically, the majority concludes that the racial animus of Clack's direct supervisor, Bill Murphy, who reported the incident in question, should not be imputed to the upper-level manager who made the ultimate termination decision because that decision was based on management's independent investigation into the incident. I believe that this investigation was insufficient to sterilize the termination decision from the taint of Murphy's racial animus because it failed to consider what role Murphy's racial animus may have played in the incident. Accordingly, I respectfully dissent.

"[W]hen a plaintiff challenges his termination as motivated by a supervisor's discriminatory animus, he must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't*, --- F.3d ---, No. 08-5082, 2008 WL 4977335, at *9 (6th Cir. Nov. 25, 2008). If the plaintiff can show that "the supervisor's racial animus was the cause of the termination or somehow influenced the ultimate decisionmaker," such that the ultimate decision maker "'acted as the conduit of [the supervisor's] prejudice—his cat's paw—the innocence of [the ultimate decisionmaker] would not spare the company from liability.'" *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)).

The majority contends that the investigation conducted by Rock-Tenn management was sufficient to break the causal chain between Murphy's racial animus and the ultimate decision by Rock-Tenn's general manager, Walter Lancaster, to terminate Clack. Although the record indicates that Lancaster based his termination decision on that investigation, an independent investigation is not always sufficient to absolve an employer of Title VII liability. In *Wilson v. Stroh Companies*, 952 F.2d 942, 946 (6th Cir. 1992), we held that a direct supervisor's racial animus could not be imputed to the ultimate decisionmakers when the termination decision was based on an independent investigation, coupled with a lack of evidence that the supervisor had failed to report similar misconduct by white employees and a lack of evidence that the ultimate decisionmakers had relied on a false record created by the supervisor. By contrast, in *Madden* we held that the racial animus of a supervisor could be imputed to the ultimate decisionmakers, notwithstanding the fact of an independent investigation, when there was evidence that the supervisor did not report similar misconduct by white employees. 2008 WL 4977335, at *9-10. Thus, although the fact of an independent investigation is an important factor, it is not always sufficient to break the causal chain between a supervisor's racial animus and the ultimate decisionmaker's decision to terminate the employee.

I do not believe that the investigation conducted here was sufficient to sterilize the termination from the taint of Murphy's racial animus. The investigation consisted of (1) an initial meeting of the plant superintendent, Mike McDougal, with Clack and union representatives, and (2) a follow-up meeting of Lancaster with Clack, Murphy, and various

superintendents and union representatives. Although McDougal and Lancaster gave Clack an opportunity to present his version of the events surrounding his alleged insubordination, nothing in the record suggests that McDougal or Lancaster investigated the possible role that Murphy's discriminatory animus may have played in the incident. Given Clack's contention that he was essentially framed or set up by Murphy and the inference that McDougal and Lancaster knew of Murphy's racial animus, I believe that the investigation conducted here was severely deficient.

Taking the facts in the light most favorable to Clack and drawing reasonable inferences in his favor, we must assume that McDougal and Lancaster knew about Murphy's racist remarks, his discriminatory treatment of African-American employees, and his hostility toward Clack in particular. The affidavit of Ted Bonine, a former foreman at Rock-Tenn who worked with Murphy between 1999 and 2002, detailed a series of racist remarks by Murphy, some of which were specifically directed at Clack. Bonine stated that he had "complained to management about Murphy but to my knowledge nothing was done about it." J.A. at 367 (Bonine Aff. at 2). Bonine further stated that "[i]t was my observation, experience and belief that Murphy's general attitude and feelings were known throughout the facility." *Id.*

Because we must assume that McDougal and Lancaster had knowledge of Murphy's racial animus, they had reason to suspect that Murphy's racist motives could have played a role in the incident for which Clack was fired. At the very least, they had reason to

suspect that there were additional relevant facts surrounding the incident beyond Clack's allegedly insubordinate conduct. However, the investigation conducted by McDougal and Lancaster did nothing to probe what role Murphy's racial animus might have played in the events in question. Instead, they conducted an investigation with blinders on, narrowly focused on the details of Clack's conduct. During the meeting of McDougal with Clack and union representatives on February 2, 2005, for instance, McDougal never inquired into what role, if any, Murphy's racial animus may have played in the incident. *See* J.A. at 133-63 (Meeting Tr.). Not surprisingly given the limited focus of the investigation, Lancaster's explanation of his decision to terminate Clack had a similarly narrow focus on Clack's alleged misconduct, without any discussion of the potential role of Murphy's racism. As Lancaster stated at his deposition, Clack "was directed to do a cleanup job and he refused to do it . . . . I saw that as a violation of our general regulations and discharged him." J.A. at 464 (Lancaster Tr. at 72).

Of course, an independent investigation *could* have absolved Rock-Tenn of Title VII liability. When faced with the conflicting stories of two employees, "there is probably no practical step an employer can take beyond independently investigating the misconduct charges that will reduce the chances of an employee's racism influencing its behavior." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 920 (7th Cir.), *cert. denied*, 128 S. Ct. 357 (2007). However, I believe that the type of narrowly focused investigation conducted here is insufficient in this context. When an ultimate decisionmaker has knowledge of a supervisor's racial animus and that supervisor reports an employee in the protected class

leading to his termination, management's investigation should not focus only on the employee's alleged misconduct. Instead, management should broaden the scope of the investigation to consider what role, if any, the supervisor's racial animus may have played in the events in question. I believe that this approach effectively balances competing concerns. On the one hand, it takes seriously the allegations of employees such as Clack who say they were framed for misconduct by racist coworkers or supervisors. At the same time, it is not too demanding of employers, requiring only that they conduct a meaningful and fair-minded investigation that at least considers the possibility that the known discriminatory animus of the supervisor played a role in the disputed events.

Because the investigation by Rock-Tenn management failed to investigate or consider whether Murphy's racial animus played a role in the incident in question, I believe that it was insufficient to sterilize Lancaster's decision to terminate Clack from the taint of Murphy's discriminatory animus. Accordingly, I believe that Clack sufficiently showed that the proferred reason for his termination was pretextual and that his case should have been submitted to a jury. For the foregoing reasons, I would reverse the district court's grant of summary judgment in favor of Rock-Tenn on the discrimination claim and therefore respectfully dissent.